**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| RICO J. HARRELL, SR.,      ) | Civil Action No.: |
|          ) | |
|       Plaintiff,    ) | **COMPLAINT** |
|          ) | **Violation of Title VII and** |
| vs.          ) | **42 U.S.C. § 1981** |
|          ) | **(Failure to Promote Based Upon Race)** |
| BERKELEY ELECTRIC   ) | |
| COOPERATIVE, INC.,    ) | |
|          ) | **JURY TRIAL DEMANDED** |
|       Defendant.   ) | |
| _____) | |

The plaintiff, complaining of the acts of the defendant, alleges as follows:

1.     That the plaintiff is a citizen and resident of the County of Charleston, State of South Carolina.

2.     That, upon information and belief, the defendant Berkeley Electric Cooperative, Inc. ("BEC" or "defendant") is a South Carolina corporation doing business and maintaining offices and agents in the County of Berkeley, State of South Carolina.

3.     That this court has federal question jurisdiction of the above-styled action pursuant to 42 U.S.C. §§ 2000(e)2, 3 and 5 ("Title VII"), 42 U.S.C. § 1981, and 28 U.S.C. § 1331.

4.     That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, as defendant does business in said district, plaintiff resides in the district, and a substantial portion of the facts giving rise to plaintiff's claims occurred in the said district.

## CONDITIONS PRECEDENT

5.     That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below.

6.     That at all relevant times as defined by Title VII defendant employed over fifteen (15) employees and, thus, is an "employer" as defined by Title VII and is otherwise subject to and covered by said Act.

7.     That on or about December 1, 2023, and as a result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race (in the form of failure to promote).

8.     That on or about July 16, 2024 plaintiff received a Notice of Right to Sue from the EEOC regarding the Charge of Discrimination described in Paragraph 7 above.

9.     That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which he received the Notice of Right to Sue described above in Paragraph 8.

## FACTUAL ALLEGATIONS

10.     That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11.     That plaintiff is an African-American male.

12.     That plaintiff grew up and went to school in the Awendaw, South Carolina area.

13.     That in or around February of 1997 the defendant hired plaintiff as a helper in the company's Line Department at its Awendaw District Office. In or around 2014, after a

few small promotions, plaintiff was promoted into the position of Line Foreman, a job he still occupies and performs at defendant.

14.    That in working at defendant's Awendaw District office for around 26 years, plaintiff has been able to work and live in the area where he grew up.  During this time plaintiff has gotten to know many of the people in the area, including a majority of its residents, community leaders, customers and prospective customers of BEC, as well as the employees at defendant's Awendaw District Office.  Plaintiff has made many connections in the Awendaw community and has become intimately familiar with the workings of BEC's Awendaw District office.

15.    That more specifically, as far as plaintiff's employment at defendant, he has occupied and/or was promoted into the following positions:  Helper, Apprentice, Second Class Foreman, and First Class Foreman and then, as stated, in or around 2014 the defendant promoted plaintiff into a Line Foreman position, a position which plaintiff still occupies to this day.

16.    That plaintiff's current position with BEC is a supervisory one, where plaintiff has the authority to author performance reviews, hire, discipline, and terminate the employees under him in the chain of command.  In this regard, plaintiff generally supervises three (3) Linemen and one (1) Apprentice.

17.    That as far as plaintiff's chain of command, from in or around 2014 until the end of 2022 plaintiff reported to Nick Van Allen ("Van Allen") (Caucasian), the Awendaw District Operations Manager.  Mr. Van Allen was hired into his District Operations Manager position in or around 2014 around the same time that plaintiff was promoted into his Line Foreman job.

18. That Van Allen reported directly to Tommy Harvey ("Harvey") (Caucasian), the Manager of Operations for the District. In turn, Harvey reported (and reports) directly to Timothy Mobley ("Mobley") (Caucasian), the Vice-President of Engineering and Operations.

19. That as far as work performance, by all accounts plaintiff performs his job duties in an above-satisfactory fashion and otherwise maintains an excellent employment record at defendant.

20. That in this regard, plaintiff has always received high ratings or scores on his annual performance reviews at BEC. While defendant does not provide employees with overall scores on their evaluations, it does rate its employees in nine (9) or ten (10) different metrics or categories such as business ethics, job knowledge, judgment and leadership – just to name a few. In each category the employee is given a score from the following scale: marginal (the worst score), inconsistent, proficient, excellent, and exemplary (the best or highest score). On two (2) out of plaintiff's last five (5) performance reviews (2018 and 2020) he was given a mixture of proficient and excellent ratings *in every single category in his performance evaluations.* In the other three (3) years (2019, 2021 and 2022) plaintiff was again given "proficient" and "excellent" ratings in all categories with the exception of the "leadership" category where plaintiff received "exemplary" ratings – the highest rating available. In addition to the above, plaintiff regularly received performance-based raises, and plaintiff's supervisors always told plaintiff that he did a good job.

21. That as to discipline, plaintiff has only been disciplined one (1) or two (2) times in his nearly twenty-six (26) years of employment at BEC – a verbal warning twenty (20) years ago for dropping and damaging a transformer when he was unloading 40-50 transformers

with a forklift from a truck, and a written warning in 2020 for not putting safety signs up when a plaintiff and a crew were working to restore power to residents after a tornado. Plaintiff objected to the latter discipline, as he was never required to put up such signs under these circumstances in the past. It is plaintiff's understanding that, as a result, the discipline was withdrawn.

22.    That finally, in regard to plaintiff's performance at defendant, the length of his employment there speaks for itself when it comes to assessing plaintiff's skillset, performance, and value as an employee to the defendant.

23.    That once plaintiff became a Line Foreman in 2014, plaintiff would routinely be assigned to perform the duties of his supervisor's job (the District Operations Manager) whenever the District Operations Manager was not at work. As such, plaintiff not only learned and excelled in performing the duties of his new Line Foreman job, but plaintiff also learned and excelled in performing the duties of the District Operators Manager job (the position that is the subject of this claim). More specifically, whenever Van Allen, the District Operations Manager at the time, was absent from work on sick or vacation leave, or when he was in training, and oftentimes on weekends (when he would spend time on his boat), he would assign plaintiff to be the acting District Operations Manager and he would give plaintiff authority to perform all of the duties of that job. All in all, plaintiff estimates that over the last eight (8) or so years, he spent around sixty (60) or more days each year working as the District Operations Manager at the Awendaw District. In fact, plaintiff was assigned to serve as the District Operations Manager for all of January 2023 and just short of two weeks in February of 2023. In performing the District Operations Manager job as long and as often as plaintiff has, by 2022 plaintiff had become very familiar with and proficient at performing the job. Not just that,

plaintiff was able to perform the duties of that job in an above-average fashion, with no issues or problems.

24.     That for the most part, plaintiff's long career at defendant has been a smooth and successful one, without incident. The only issue plaintiff had – and it was not really an issue – was in or around 2020 when the defendant was going to give plaintiff the written warning referenced above for failure to put up safe work zone signs while plaintiff and his crew were attempting to restore electricity to the area's residents after a tornado. At the time, the practice at BEC from what plaintiff was told and from what plaintiff observed was that they were not required to put up warning signs when restoring power after a natural disaster. To do so during an emergency situation when they were trying to restore power to defendant's customers would be ineffective and a poor use of their time as the signs were so light in weight and flexible that they would blow over or away during storms. Given the high priority and the importance of restoring power to defendant's customers, there was no time to stop work to put up the signs and to then tend to them when they were blown down or away by a storm. At least that is the way plaintiff did it for 23 years of employment at BEC. Consistent with plaintiff's understanding of the practice, in 23 years, he never observed any other BEC employees putting up safety signs while trying to restore power after a natural disaster. And plaintiff was not aware of any work rule or practice that required defendant's employees to put the signs up. Thus, plaintiff did not believe he had done anything wrong.

25.     That also at or around this same period of time defendant hired a new Safety Director, Jason Smith ("Smith") who apparently began to enforce work rules that had not been previously enforced or that did not exist. Because plaintiff did not believe that he had done anything wrong or violated any work rules by not putting up the signs, plaintiff objected to

6

receiving the write-up to Smith, the Safety Director.  When the Safety Director refused to alter or retract the discipline, plaintiff then exercised his rights under defendant's open-door policy and spoke to the CEO of defendant about the write-up.  In response, the CEO told plaintiff that he understood and that he would take care of the issue. From this it was plaintiff's understanding that the issue had been resolved and that the write up plaintiff had received had been withdrawn and taken out of his file.

26.    That after speaking with the CEO about it, plaintiff considered the matter resolved.  And the above incident was never brought up again.

27.    That another issue plaintiff had with defendant was his observation that an overwhelming majority of mid and high-level management positions at defendant were filled by Caucasians.  This was certainly the case in plaintiff's own chain of command, where every management employee above  plaintiff was Caucasian.  But plaintiff's observation really began to hit home over the years when plaintiff applied for and was rejected from the following three (3) positions where, in each instance, plaintiff was qualified for the job and yet the successful candidates were Caucasian:

❖ In 2013 plaintiff applied for an Operations Manager Assistant position open at defendant's Johns Island, South Carolina office.  Plaintiff was rejected from the job allegedly because the successful applicant (a Caucasian) knew the Johns Island District better than plaintiff did;

❖ In or around 2019 plaintiff applied for and was rejected from a Safety Specialist position.  Again, the company opted to hire a white employee; and

❖ In or around 2021 plaintiff applied for and was rejected from a Maintenance Manager position.  Instead, defendant hired a Caucasian employee for that job as well.

28.    That despite the above, plaintiff kept his head up and continued to perform his job, as well as the job of District Operations Manager (on a regular basis).  In the meantime,

plaintiff kept his racial observations to himself and all went relatively well for the next year or two.

29.     That another alleged incident took place in or around February of 2022 when plaintiff asked his supervisors if he could take vacation leave from September 21, 2022 until October 3, 2022 so that he could go on a cruise with a coworker.  Plaintiff's supervisor Van Allen approved the vacation leave without hesitation, comment or objection.  That same month (February of 2022) plaintiff's and his coworker booked the cruise. The payment was nonrefundable.

30.     That some seven (7) months later (a couple days before plaintiff's scheduled and approved vacation) and with it still being hurricane season, as a courtesy plaintiff doublechecked with his supervisor (Van Allen), asking if it was still okay to take vacation leave. Later Van Allen told plaintiff that he had checked with his two bosses (Harvey and Mobley) and that they approved plaintiff's trip (for a second time).

31.     That plaintiff was not required to seek permission to go on the trip a second time (or to doublecheck with defendant).  And, there is no work rule that prohibits defendant's employees from taking vacation leave during hurricane season.  Plaintiff was just being considerate and responsible.  Otherwise, during the few days before plaintiff left for vacation, as well as on the day he left, the weather in the Awendaw/Charleston area was sunny and clear with no signs of any hurricane or other storms or disasters in sight.  Likewise, the entire week or so plaintiff was on vacation (or at least for most of it) the weather remained good in the Awendaw/Charleston area until on or about October 1, 2022 when Hurricane Ian hit Georgetown, South Carolina as a category 1 storm.  However, when plaintiff left for vacation, he was not aware of this or any other storm.  And this was not an issue at the time in any sense of

the word.  Plaintiff took a pre-approved vacation, returned, and went back to work.  At the time, no one said anything to plaintiff about it or admonished plaintiff for taking the vacation.

32.    That at the same time, throughout 2022 Van Allen began to openly state that he was ready to stop working, ready to retire, and that he would be retiring soon.  At the time he had not taken any formal steps with the company to retire, but he repeatedly made his intensions clear to those who worked with him.

33.    That in or around early December of 2022, Harvey called plaintiff and told plaintiff that plaintiff needed to apply for a Systems Control Manager position that was open in BEC's Moncks Corner location.  In doing so Harvey made a strong effort to convince plaintiff to apply for the job.  At the time, Van Allen had not yet made his retirement announcement (but everyone knew it was coming), so plaintiff took Harvey's advice and applied for the job.  However, plaintiff quickly withdrew his application, deciding that he wanted to stay in the Awendaw area rather than work so far from home with such a long drive to and from work every day.

34.    That in or around December of 2022, shortly after Harvey convinced plaintiff to apply for the management job in Moncks Corner, Van Allen called plaintiff and told plaintiff he was officially retiring that month.  Van Allen also made it a point to tell plaintiff during the call that *plaintiff was the man for the Operations Manager job* and that *plaintiff could already perform* the duties of the job.  Before hanging up, Van Allen also told plaintiff that, when upper management asked him to recommend someone to replace him, he strongly *recommended plaintiff for the job*.  Shortly thereafter, Van Allen officially announced his retirement.  Obviously at that point it was common knowledge at defendant that Van Allen's job would soon be posted.

35.    That in retrospect, Harvey's attempts to convince plaintiff to apply for the Moncks Corner job are suspicious because it appeared Harvey was trying to take plaintiff (the most qualified candidate for the job and an African American) out of the running for the Awendaw District Operations Manager position that was about to come open, all so defendant could place a Caucasian into the position.  Moreover, if Harvey believed plaintiff could perform the Systems Control Manager job in Moncks Corner, then he certainly must have believed plaintiff could have performed the Operations Manager job in Awendaw.

36.    That on or about January 3, 2023, defendant sent out a brief email to all employees at the company announcing that the District Operations Manager position (which Van Allen had just vacated) was open and available for internal applications.  The internal email further stated that the company would accept applications for the job for another five (5) days, until January 8, 2023.  Otherwise, the said email did not contain any information regarding any qualifications or requirements for the job.  Moreover, the email did not identify the criteria defendant planned to use in selecting the successful candidate.

37.    That sometime in or around early January of 2023, after the Operations Manager job became open but before any interviews took place, Ricky Driggers ("Driggers"), a Caucasian Line Foreman who worked at defendant's Moncks Corner location (and who ended up being the successful candidate for the job) drove to defendant's Awendaw facility, approached plaintiff, and stated that if he (Driggers) was selected to be the next Operations Manager, he did not want there to be any hard feelings between he and the plaintiff.  In making the remark, Driggers' tone and demeanor were as if he had already been told that he would be the successful candidate for the job.

38.    That in all events, believing and knowing from personal experience that he was especially qualified for the Awendaw District Operations Manager job, plaintiff timely submitted his application for the position to the defendant.  While plaintiff does not know how many employees applied for the position, he does know that the following five (5) employees were interviewed for the job:

    (i)    Ricky Driggers, Caucasian
            Line Foreman at BEC's Moncks Corner location

    (ii)    Fred Cox, Caucasian
            Operations Manager Assistant at BEC's Johns Island location

    (iii)    William Burbage, Caucasian
            Crew Lead at BEC's Goose Creek location

    (iv)    Teddy Jeffords, Caucasian
            Safety Specialist at BEC's Moncks Corner location

    (v)    Rico Harrell, African American
            Line Foreman at BEC's Awendaw location

Plaintiff was the only African-American applicant interviewed.  He was also the only applicant who was actually working at the defendant's Awendaw district to be interviewed – the very district where the open position existed.

39.    That on or about January 9, 2023, plaintiff had his first interview for the Operations Manager position – an interview plaintiff had thought about and desired for a long time.  Plaintiff was interviewed by the two (2) Caucasian supervisors that Van Allen had reported to:  Tom Harvey and Timothy Mobley.  In addition, Louise Meade ("Meade") (Caucasian), the company's Vice-President of Human Resources, also attended the interview. The interview lasted about an hour and a half and, by all measures, it was a positive interview where plaintiff performed well and received positive feedback from his interviewers.

40.    That in this regard, during the interview Mobley gave plaintiff the "thumbs up" sign on at least three (3) different occasions, whenever he liked the way plaintiff answered a given question. Moreover, after the interview, the interviewers told plaintiff he had done a good job and interviewed well.  Plaintiff left the interview feeling confident and like he had a real chance of getting the job.

41.    That on or about January 31, 2023, plaintiff had his second interview for the job.  This interview was remarkably different from the first one.  This time only Mobley and Harvey were present.  Unlike the first interview, the Human Resource Director did not attend. Also, unlike the first interview, the tone of the second interview was not friendly or polite. Instead, the interviewers became critical towards plaintiff.  To plaintiff's surprise, all of the negativity and criticism during the interview involved the vacation plaintiff took in September of 2022.  Plaintiff estimates that Mobley and Harvey spent almost the entire second interview asking him questions, in a critical and antagonistic manner, about that vacation.  The gist of their criticism was that a higher-level supervisor such as the plaintiff should not be taking a vacation during hurricane season when imminent storms, inclement weather, or natural disasters were looming – even if the vacation had already been scheduled and approved.  In such a case, according to the interviewers, the supervisor should have known without being told to cancel the vacation.  In the opinion of plaintiff's interviewers, plaintiff allegedly displayed poor judgment in not cancelling his trip.  It is curious that defendant criticized plaintiff on this issue given plaintiff had gone above and beyond in terms of following policy in requesting and taking the vacation.

42.    That in questioning and critiquing plaintiff in this manner, the interviewers drew a false picture of plaintiff, a 26-year employee with the company, and a member of the

community, as being so excited about a one-week cruise, that in the midst of imminent danger he selfishly took the vacation, ignoring the advice of management, ignoring the disruption plaintiff's absence would cause in the workplace, and placing the members of his own community in danger.

43.    That nothing could be further from the truth (or the actual facts).  And this truth and these facts are not in dispute:

(a)    Some seven (7) months before the cruise, plaintiff sought, requested and received written permission to go on the vacation.  Seven (7) months advance notice to go on a vacation provides the company with more than sufficient notice;

(b)    Not only that, but seven (7) months later, knowing it was still hurricane season, plaintiff went to management a few days before leaving for his vacation and doublechecked as to whether or not he should still take it. And, for the second time, defendant approved the vacation.  In fact, it was both, or at least one, of plaintiff's interviewers who had approved the trip when plaintiff doublechecked if he could still go;

(c)    The entire week leading up to plaintiff's vacation, including the day he left, the weather in Awendaw and the greater Charleston area was fine or nice.  Specifically, on the day plaintiff left for the vacation, ***there were no signs or information that a storm or hurricane or any other inclement weather condition was coming to the Awendaw area;***

(d)    The entire week plaintiff was on vacation the weather in the Charleston area was still nice.  All of the above is easily proven by looking online for the days in question;

(e)    Not one supervisor told plaintiff to cancel his vacation, or that it was ill timed, or that it may set a bad example.  On the contrary, when plaintiff doublechecked about the vacation, right before leaving, management gave plaintiff the green light to go on the cruise, without hesitation, for a second time;

(f)    Defendant does not have any work rule prohibiting vacations during hurricane season.  Thus, plaintiff did not violate any work rules in taking the vacation, and plaintiff was not disciplined or admonished in any way for doing so;

(g)   As a long-term employee with over 25-years of employment at defendant, and as an employee who grew up in the area, and who cared for the residents of his community, plaintiff would have never gone on a vacation if he became aware of any threatening weather conditions before he left for his trip.  In such circumstances, plaintiff would have immediately cancelled his vacation without being told to do so; and

(h)   Both interviewers admitted plaintiff had not done anything wrong on this occasion during the interview and in his rejection memo.

44.   That despite the critical tone of the interview, plaintiff remained polite, but felt he had to defend himself against a non-issue and a false narrative that had nothing to do with his abilities to perform the Operations Manager job. After plaintiff's interview, he still felt he did a good job and that, with all of his qualifications, plaintiff still had the best chance of getting the promotion.  Thereafter, plaintiff went back to work as usual.

45.   That on or about February 13, 2023 Harvey came to defendant's Awendaw offices specifically to talk with plaintiff.   Harvey then told plaintiff he had not been selected for the Operations Manager position.  Surprised, disappointed and curious as to why he had not been selected, plaintiff told Harvey he was very disappointed with him and the company and plaintiff asked Harvey why he was not chosen for the job.  Harvey responded in vague terms stating that "the company was going in a different direction."  In fact, he told plaintiff that twice.  By the second time Harvey said it to plaintiff, his face started to turn red and he became visibly nervous or uncomfortable.  Plaintiff then asked if the defendant would be willing to send him something in writing stating why he was not selected – just so plaintiff could learn from the constructive criticism.  Harvey responded in the affirmative.

46.   That in the meantime, it became known that the successful candidate for the position was Ricky Driggers, a less-qualified, less-senior Caucasian employee (who had

14

forecasted his selection by making a special trip to Awendaw to tell plaintiff he did not want any

hard feelings if he got the job).  Driggers, who had been with the company for at least seven (7)

years less than plaintiff, was not even minimally qualified for the job as, contrary to defendant's

policy, he did not live within twenty (20) miles of the Awendaw duty station.

      47.    That on or about February 17, 2023, defendant sent plaintiff a

memorandum outlining five (5) reasons why he had been rejected from the job.  In general, those

reasons were as follows:

      (a)    Plaintiff went on vacation from September 21 – October 3, 2022
      when defendant was preparing for the prospect of a major storm
      threat (and, thus, outages) and that did not set a good example;

      (b)    Since plaintiff had denied any wrongdoing in regard to his 2022
      vacation, the interviewers concluded plaintiff could not accept
      responsibility for his mistakes or accept criticism and, thus, plaintiff
      could not grow as an employee;

      (c)    The performance evaluations plaintiff authored for his employees
      lacked quality;

      (d)    Plaintiff's written communication skills were not up to standards;
      and

      (e)    Plaintiff had less experience with complex underground construction
      than Driggers.

      48.    That the reasons given to plaintiff by defendant for rejecting him from the

position were either false, lack credibility, or were so trivial they should not have caused an

employee like plaintiff to have been rejected from a job that was a natural fit and progression for

him and the defendant.  Moreover, plaintiff was more qualified for the position than the

successful candidate (Driggers) and there is other circumstantial evidence of discrimination.

      49.    That as to the fact that plaintiff was rejected from the job for false reasons

or reasons unworthy of credence, the first two reasons defendant provided to plaintiff for being

rejected from the job (plaintiff's vacation and not taking responsibility for it) are clearly false and do not come close to being credible. First, plaintiff strictly followed the terms of defendant's vacation policy when he requested and took his vacation in 2022. Indeed, he did much more than the policy required, thereby setting a strong example for other employees. Not only did he secure the company's approval for the vacation *seven (7) months* in advance, but he also doublechecked with defendant and again secured approval for the trip from the defendant several days before leaving for his vacation. Moreover, he had no notice that inclement weather would strike while he was gone. And, plaintiff's interviewers acknowledged plaintiff had done nothing wrong in taking the vacation. Indeed, plaintiff's actions on this occasion were the kind of responsible and conscientious actions that set good examples for employees and the type of conduct defendant should expect from its supervisors. This incident should have been used as a compelling reason to place plaintiff into the position rather than used as a reason to exclude him from it.

50.    That moreover, the way plaintiff handled his requests for his 2022 vacation had absolutely nothing to do with whether plaintiff could perform the duties of the District Operations Manager job – none whatsoever. Finally, the allegation that plaintiff cannot accept responsibility for his actions is false. Plaintiff took responsibility for the verbal warning he received for dropping and damaging a transformer while unloading 40 to 50 of them from a truck. With the vacation issue, plaintiff did not do anything wrong and, thus, there was nothing for him to own up to.

51.    That in addition, reasons (c) and (d) are likewise false and/or unworthy of credence. Plaintiff was never once disciplined for the way he prepared a performance evaluation for one of his employees. Likewise, defendant never once mentioned or addressed this alleged

issue on any of plaintiff's performance evaluations. And, it was not brought up in any of the interviews plaintiff had for the job. Moreover, the evaluations in question are completed on a company form and plaintiff merely had to timely complete the evaluation paperwork and rate the employee in an honest manner – which he did.

52.    That plaintiff was also never disciplined or admonished by defendant for his written communication skills, either through discipline or on any performance review. And this issue was not addressed or mentioned in either of plaintiff's interviews.

53.    That on the contrary, plaintiff was rated "proficient" in the communications section of his last five (5) reviews from 2018-2022. In 2018 plaintiff's supervisor rated plaintiff as "proficient" in communications and in the comment section for that category he stated, "Very good communicating **by all methods.**" On plaintiff's 2020 evaluation in the same section, his supervisor again rated plaintiff as proficient and stated, "Good communication and uses to help and assist all." And on plaintiff's 2021 evaluation, his supervisor once again rated plaintiff as proficient in the communications section of plaintiff's evaluation and wrote in the same section, "Communicates **well using all available resources**."

54.    That the final reason defendant gave plaintiff for rejecting him from the District Operations Manager job also lacks credibility. Plaintiff does have experience with complex underground construction and he also has significant experience in complex overhead construction, while Driggers has less experience than plaintiff in the latter area. Thus, plaintiff's experience in this area is better than, or at least equal to, Driggers' experience.

55.    That not only was plaintiff rejected from the job for false reasons or reasons unworthy of credence, but he was also more qualified for the open position than the successful candidate as evidenced by the following:

(a)    Out of all five (5) of the candidates interviewed, plaintiff had seniority over most, if not all, of them, having served twenty-six (26) years at defendant. And, ***plaintiff had at least seven (7) years of seniority over Driggers;***

(b)    Plaintiff is an exemplary employee at defendant; he has always been given high ratings on his annual performance reviews and had only been disciplined once or twice in 26 years of employment at defendant;

(c)    Plaintiff was the only candidate who grew up in the Awendaw District, went to school there, and who lived in the district for an extended period of time. Plaintiff was also the only candidate for the job that worked at the Awendaw District.  As such, unlike the other applicants, plaintiff knows where all the power lines are located in the district; he knows the employees who work at the Awendaw District; plaintiff knows BEC customers who live in the district; and, in general, plaintiff knows the people in the community there, and has many connections;

(d)    Unlike Driggers and the other candidates, plaintiff directly reported to the ***precise position*** in the ***precise district*** where the open position existed and had done so for at least eight (8) years before applying for the job.   During this eight (8) year period, the outgoing Operations Manager and plaintiff had a strong and productive working relationship.  This mutually respectful relationship, and the mere fact that plaintiff reported directly to the District Operations Manager, taught plaintiff a lot about the duties of the open position and how to perform it.  It gave plaintiff general familiarity with the job.  None of the other candidates had this experience;

(e)    More to the point, unlike the other applicants, including Driggers, plaintiff ***actually performed the duties of the Operations Manager job on a regular basis for at least the past seven (7) to eight (8) years***, working in the position approximately sixty (60) days or more each year whenever Van Allen had to miss work.  And plaintiff did it without issues or problems.  Actually performing the duties of the precise job in the same location where the open job existed provided plaintiff with special, unmeasurable insight into virtually all aspects of the position.   Again, none of the other remaining four (4) candidates had such experience.  This experience is alone enough to have selected plaintiff to be the next Operations Manager;

(f)    Plaintiff's supervisor, Van Allen, actually recommended plaintiff for the job to the decision makers, Harvey and Mobley.  When Van Allen called plaintiff to let him know he was retiring, Van Allen told

plaintiff that plaintiff was the man for the job; that plaintiff could already perform the duties of the job; and that when his bosses (the decision makers) asked Van Allen to recommend his replacement, he strongly recommended plaintiff;

(g)  That on three (3) of plaintiff's last five (5) annual performance reviews (2019, 2021 and 2022) he was given "exemplary" ratings – the highest rating available - in the category of "Leadership."  To this point, on plaintiff's 2019 review, his supervisor commented in the leadership section that "This is the strongest of all your areas…." In 2021, plaintiff's supervisor commented in the leadership section of plaintiff's review, "Great leadership year after year." And in that same section in plaintiff's 2022 review plaintiff's supervisor wrote "Your leadership skills are above and beyond;" and

(h)  Plaintiff obtained an Associate's Degree at Trident Technical College in HVAC and he also has an Electrical Commercial Contractors license – two qualifications Driggers does not have.

56.    That in addition to the above, the following provides further evidence that

plaintiff was not promoted because of his race:

(a)  Predominantly all of defendant's upper management (and, for that matter, middle management) positions are occupied by Caucasians. Certainly every manager in plaintiff's chain of command is Caucasian;

(b)  During plaintiff's 26-year career at defendant he has applied for at least four (4) different jobs/promotions.  Plaintiff was rejected from all four (4) of them and each time a Caucasian employee was hired into the job;

(c)  Plaintiff does not believe defendant used objective hiring criteria in selecting the new Operations Manager.  At least it never shared any such criteria with plaintiff.  And, to plaintiff's knowledge, it has not published any such criteria in its handbook or in any policy.  Instead, defendant used subjective criteria to pre-select Driggers for the job;

(d)  At the same time, the decision makers discouraged plaintiff from applying for the job and, upon information and belief, they had pre-selected Driggers, a less-qualified Caucasian for the position.  To this point, right before Van Allen officially announced his retirement, but before the position was posted as open, Harvey (Van Allen's direct supervisor and soon-to-be supervisor over the successful candidate) called plaintiff and attempted to persuade plaintiff to apply for a

19

Systems Control Manager job that was open at defendant's Moncks Corner office, telling plaintiff he should apply for that job and that it would be a good job for plaintiff.  In fact, plaintiff actually applied for the position but quickly withdrew his application.  From this, an inference can be drawn that a decision maker was attempting to take plaintiff, an African American (and the most qualified applicant), out of the applicant pool for the District Operations Manager job that was about to come open so they could place a less-qualified Caucasian into the position;

(e)  Around the time the Operations Manager job came open (but before the interviews) Driggers drove all the way from defendant's Moncks Corner District Office to defendant's Awendaw District Office to tell plaintiff that if he (Driggers) was selected to be the next Operations Manager, he did not want any hard feelings between he and the plaintiff.   In making the remark, Driggers' tone and demeanor suggested that he had already been told he had been selected for the position; and

(f)  Policy 432 of the BEC Policy Binder states in pertinent part that any employee subject to being on call must live within twenty (20) miles of the assigned duty station so that they can respond to outages quickly.  For this reason Driggers was not qualified to apply for or to otherwise occupy the Operations Manager position in BEC's Awendaw office because he is subject to being on call and he lives more than twenty (20) miles away from it and, thus, holding a position in Awendaw violates Policy 432.

## **FOR A FIRST CAUSE OF ACTION**
## **VIOLATION OF TITLE VII**
## **42 U.S.C. § 2000e-2 and 5**
## **(Failure to Promote Based Upon Race)**

57.    That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 57 hereinabove as fully as if set forth verbatim.

58.    That as an African-American, plaintiff belongs to a protected class.

59.    That as alleged above, plaintiff timely applied for the District Operations Manager job and, thereafter, was interviewed on two (2) separate occasions for it.

60.    That plaintiff was especially qualified for the job, as he had directly reported to the open position in the same district for eight (8) years; he actually performed the

20

duties of the District Operations Manager job at least approximately sixty (60) days a year for the past seven (7) or eight (8) years; and, when he did, he performed the duties of the job in a satisfactory manner.

61.     That despite the above (and despite other circumstances favoring plaintiff), defendant rejected plaintiff from the job and, instead, hired a less-qualified, less senior, Caucasian employee – an employee who is outside of plaintiff's protected class and an employee who lived outside of the twenty (20) mile area that he was required to live in to be qualified for the job.

62.     That in addition to rejecting plaintiff from the job despite the fact that plaintiff was more qualified than the successful candidate, defendant rejected plaintiff from the said position for reasons that are false and/or that are unworthy of credence, all as outlined in Paragraphs 49-56 above.

63.     That as such, defendant failed to promote plaintiff because of his race and thereby violated Title VII, 42 U.S.C. § 2000e-2 and 5 (the Civil Rights Act of 1964).

64.     That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and plaintiff further seeks his attorney's fees and costs and prejudgment interest.

65.     That the defendant's actions as set forth above were undertaken intentionally, knowingly, willfully, wantonly, recklessly, maliciously and with utter disregard for

the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

**FOR A SECOND CAUSE OF ACTION**
**VIOLATION OF 42 U.S.C. § 1981**
**(Failure to Promote Based Upon Race)**

66.    That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 65 hereinabove as fully as if set forth verbatim.

67.    That as an African-American, plaintiff belongs to a protected class.

68.    That as alleged above, plaintiff timely applied for the District Operations Manager job and, thereafter, was interviewed on two (2) separate occasions for it.

69.    That plaintiff was especially qualified for the job, as he had directly reported to the open position in the same district for eight (8) years; he actually performed the duties of the District Operations Manager job at least approximately sixty (60) days a year for the past seven (7) or eight (8) years; and, when he did, he performed the duties of the job in a satisfactory manner.

70.    That despite the above (and despite other circumstances favoring plaintiff), defendant rejected plaintiff from the job and, instead, hired a less-qualified, less senior, Caucasian employee – an employee who is outside of plaintiff's protected class and an employee who lived outside of the twenty (20) mile area that he was required to live in to be qualified for the job.

71.    That in addition to rejecting plaintiff from the job despite the fact that plaintiff was more qualified than the successful candidate, defendant rejected plaintiff from the said position for reasons that are false and/or that are unworthy of credence, all as outlined in Paragraphs 49-56 above.

72.    That as such, defendant failed to promote plaintiff because of his race and thereby violated 42 U.S.C. § 1981.

73.    That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and plaintiff further seeks his attorney's fees and costs and prejudgment interest.

74.    That the defendant's actions as set forth above were undertaken intentionally, knowingly, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

WHEREFORE, as to all causes of action, plaintiff prays for judgment against the defendant for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the costs and disbursements of this action, including his

reasonable attorney's fees, prejudgment interest, and for such other and further relief as the court

deems just and proper.

HITCHCOCK & POTTS By:

s/*A. Christopher Potts*
A. Christopher Potts
Federal ID No.: 5517
222 West Coleman Blvd., Suite 124 #11
Mt. Pleasant, SC 29464
Telephone: (843) 577-5000
Email: cpotts@hitchcock-potts.com
***Attorneys for the Plaintiff***

Charleston, South Carolina
September 26, 2024